UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| HUNG LAM, | Case No. 5:14-cv-00877-PSG |
| Plaintiff, | **ORDER GRANTING-IN-PART MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| CITY OF SAN JOSE, et al., | **(Re: Docket No. 37)** |
| Defendants. | |

On January 3, 2014, Defendant Dondi West, a San Jose police officer, arrived at 1825 Cape Horn Drive to find Plaintiff Hung Lam standing in the front yard holding what she thought was a knife.[1] Within the next few minutes, West shot Lam,[2] rendering him a paraplegic.[3] A month later, Lam filed this suit against West, San Jose Police Chief Larry Esquivel and the City of San Jose, alleging civil rights violations under 42 U.S.C. § 1983 and various tort claims.[4] Defendants now move for partial summary judgment on Lam's Section 1983 claims, arguing that Lam has failed to provide evidence such that a reasonable jury could find that (1) West's use of deadly force was unwarranted; (2) West should not receive qualified immunity and (3) the City is liable under

---

[1] *See* Docket No. 38 at ¶¶ 2-3.

[2] *See id.* at ¶ 12.

[3] *See* Docket No. 1 at ¶ 2.

[4] *See id.*

1
Case No. 5:14-cv-00877-PSG
ORDER GRANTING-IN-PART MOTION FOR PARTIAL SUMMARY JUDGMENT

*Monell v. Department of Social Services*[5] for its failure to train its officers properly. Defendants' motion for partial summary judgment is GRANTED only as to Lam's claim under *Monell*.

## I.

On January 3, 2014, Lam and his boyfriend, Kevin Wade, were planning to travel to Sacramento where Lam's family lived.[6] The two first went to Lam's house, where Wade left Lam in the foyer and went upstairs to Lam's bedroom to collect some of Lam's clothes.[7] When Wade came back down, he found Lam holding a knife and worried that there was someone else in the house.[8] Wade persuaded Lam to walk out to his house's yard and then tried to convince Lam to give him the knife, saying he would call 911 if Lam did not.[9] Lam refused and began threatening to hurt himself.[10] Around this time, Lam's neighbors, Herman and Helen Anderson, were arriving home, and Wade waved them down and asked them to call the police.[11] Herman Anderson went inside to call 911 from a landline, and Helen Anderson, a retired San Mateo County Deputy Sheriff, got out of the car and walked toward Lam's house.[12]

By this time, Wade had moved across the street, and Anderson started talking to Lam.[13] Anderson could not understand most of what Lam was saying, but she recalls that he was looking at Wade across the street and periodically raising the knife to his wrist.[14] Sometime later, while

---

[5] 436 U.S. 658 (1978).

[6] *See* Docket No. 42-5 at 64:3-5; Docket No. 43 at 21:11-12, 23:1-3.

[7] *See* Docket No. 43 at 23:1-8.

[8] *See id.* at 24:13-25:19.

[9] *See id.* at 25:21-26:11.

[10] *See id.* at 26:1-11, 26:25-28:18.

[11] *See id.* at 27:11-14; Docket No. 47 at 26:6-13; Docket No. 50-1 at 74:21-75:1.

[12] *See* Docket No. 50-1 at 14:12-19:25, 82:16-20, 87:18-88:20.

[13] *See id.* at 90:15-91:19, 92:10-18.

[14] *See id.* at 92:19-96:15.

Anderson was still trying to talk to Lam, and both of them were still some distance apart, West arrived on the scene.[15] The police radio call had described a "disturbance" involving a weapon,[16] and West saw Lam holding the knife and Anderson standing between West and Lam.[17] West told Anderson to move back towards her own house.[18] Anderson complied, backing up while still facing towards Lam.[19] West then moved from her car towards Lam and began commanding him to drop the knife and get on the ground.[20] He dropped his cell phone on the ground, but not a knife.[21] Soon afterwards, her fellow officer Dan Phelan arrived, walked onto the lawn and then went back to his police car to retrieve a 40 mm nonlethal firearm.[22]

From this point, the witnesses offer diverging accounts. According to Wade, West bore down on Lam with her gun drawn, while Lam did not advance towards her at all.[23] In the moments leading up to the shooting, Wade saw Lam standing still, with his back to both officers.[24] Consistent with Wade's testimony, Anderson testifies that Lam stayed where he was.[25] Anderson says that West shot Lam when he "turned with his back toward" the officer and made a motion with the knife pointing toward his own stomach, and that Lam did not move any closer to West

---

[15] *See id.* at 96:13-24.

[16] *See* Docket No. 50-5 at 1-2.

[17] *See* Docket No. 45 at 113:4-17, 114:14-18.

[18] *See* Docket No. 44 at 104:20-105:1; Docket No. 45 at 134:10.

[19] *See* Docket No. 44 at 105:2-106:14; Docket No. 45 at 134:17-24.

[20] *See* Docket No. 38 at ¶ 5; Docket No. 50-1 at 109:10-11, 109:23-24; Docket No. 50-7 at 37:17-38:16.

[21] *See* Docket No. 38 at ¶ 6; Docket No. 44 at 115:12-22; Docket No. 45 at 168:1-15.

[22] *See* Docket No. 38 at ¶¶ 7-8; Docket No. 45 at 168:7-22.

[23] *See* Docket No.43 at 41:21-22.

[24] *See id.* at 41:20-42:1.

[25] Docket No. 44 at 107:22-25.

before she shot him.[26] For his part, Lam remembers little of the incident other than wanting to stab himself and the intense pain of the shooting.[27]

West and Phelan remember the situation very differently. According to West, after Lam dropped his cell phone, which she had thought was a knife, he appeared to pull a knife out of his waistband.[28] She testifies that she saw the knife and backed away, and he walked forwards, away from her.[29] When he reached the driveway, however, West says that he began to walk backwards towards her with the knife, occasionally turning to face her, and she shot him the third time he turned around.[30] She says she was trying to retreat, but her foot hit a bush and she could not go any further backwards, while he had gotten very close to her by then.[31] As for Phelan, he could not see anything in Lam's hand when he arrived, and he never saw him reach into his waistband.[32] Phelan first saw the knife, which he describes as pressed to Lam's stomach, when Phelan went to retrieve the 40 mm weapon.[33] Phelan says that Lam was moving throughout in an erratic pattern, though Phelan never saw Lam advancing towards West.[34] Defendants also have provided some objective evidence, including photographs of the scene and audio recordings of Herman Anderson's 911 call and the police radio.[35] As Defendants have pointed out, these undercut the testimony from Anderson and Wade in some respects.

---

[26] *See id.* at 117:2-118:9.

[27] *See* Docket No. 42-5 at 27:2-31:19.

[28] *See* Docket No. 38 at ¶¶ 6, 8.

[29] *See* Docket No. 45 at 171:8-24.

[30] *See id.* at 183:3-185:11.

[31] *See* Docket No. 38 at ¶¶ 6, 9-10; Docket No. 45 at 227:14-229:10.

[32] *See* Docket No. 50-6 at 48:12-49:2.

[33] *See id.* at 90:23-91:4.

[34] *See id.* at 54:6-17, 55:11-57:25, 73:17-25; 118:13-18.

[35] *See* Docket No. 42-1; Docket No. 42-2; Docket No. 44 at Ex. C-G.

**II.**

This court has jurisdiction under 28 U.S.C. §§ 1331 and 1367. The parties further consent to the jurisdiction of the undersigned under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 72(a).

**III.**

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Material facts are those that may affect the outcome of the case.[36] A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.[37] All evidence must be viewed in the light most favorable to the non-moving party.[38] At this stage, a court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial."[39] "[I]n police misconduct cases, summary judgment should be granted 'sparingly' because such cases often turn on credibility determinations by a jury."[40]

However, when one party's version of the facts "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."[41] Initially, the moving party bears the burden to show that no genuine issue of material fact exists.[42] If this burden is met, the burden

---

[36] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

[37] *See id.*

[38] *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

[39] *House v. Bell*, 547 U.S. 518, 559-60 (2006).

[40] *Espinosa v. City & Cty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (quoting *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003)).

[41] *Scott v. Harris*, 550 U.S. 372, 380 (2007).

[42] *See Celotex Corp. v. Caltrett*, 477 U.S. 317, 323-24 (1986).

shifts to the non-moving party.[43] Applying the standards detailed above to Lam's claims and the evidence in the record, the court is persuaded that a reasonable jury could decide in Lam's favor on several, but not all, issues.

*First*, Lam has presented enough evidence that a reasonable jury could find that West acted unreasonably in using deadly force. The Fourth Amendment standard of "objective reasonableness" governs the use of force by police officers.[44] Relevant factors include the severity of the crime, the immediate threat posed by the suspect and whether the suspect is actively resisting or evading arrest.[45] Of these, the most important factor is the immediate threat that the suspect posed.[46] "These factors are not exclusive, and [courts] consider the totality of the circumstances."[47] Officers should be judged "without the benefit of 20/20 hindsight," and the court should take into account that police officers often must make split-second decisions in uncertain and rapidly changing situations.[48]

In general, an officer is justified in using deadly force against a suspect threatening the officer or others with a knife. Defendants point to several Ninth Circuit cases to this effect.[49] They also cite the Supreme Court's decision this year in *City & County of San Francisco v. Sheehan*.[50] In that case, two police officers each fired multiple rounds at a mentally ill woman who had threatened them with a knife and was moving towards them.[51] The officers had first tried to

---

[43] *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 630, 630 (9th Cir. 1987).

[44] *See Graham v. Connor*, 490 U.S. 386, 394-99 (1989); *Scott*, 550 U.S. at 381-83.

[45] *See Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) (en banc) (quoting *Graham*, 490 U.S. at 396).

[46] *See id.*

[47] *Id.* at 793-94.

[48] *Id.* at 794.

[49] *See, e.g.*, *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (en banc); *Reynolds v. County of San Diego*, 84 F.3d 1162, 1168 (9th Cir. 1996).

[50] 135 S. Ct. 1765 (2015).

[51] *See id.* at 1770-71.

subdue her with pepper spray, but they resorted to deadly force when she was "only a few feet away."[52] The Supreme Court affirmed the Ninth Circuit's holding that they had acted reasonably in using deadly force.[53]

But in contrast to those cases, a key factual dispute here remains unresolved: whether Lam posed an immediate threat to West or anyone else. Anderson testifies that Lam never advanced towards West.[54] In fact, Anderson says that Lam turned away from West and was making stabbing motions towards his own stomach when West shot him.[55] Wade similarly testifies that Lam never moved towards West.[56] If their accounts are accurate, Lam posed no threat towards West or anyone else.

Defendants urge the court to discount their testimony entirely, but this is not a case where their version of the events "is blatantly contradicted by the record."[57] Here, the contradicting pieces of evidence in the record are the audio recording of the police radio[58] and photos of the scene.[59] These are informative, but far less so than the video evidence in *Scott*.[60] Defendants highlight two issues with Anderson's testimony. For one thing, Anderson says that Lam did not move after he dropped his cell phone until West shot him,[61] but the photographs of the scene show that Lam's cell phone was found thirteen feet away from where he fell.[62] For another, she testifies

---

[52] *See id.* at 1771.

[53] *See id.* at 1775.

[54] *See* Docket No. 44 at 116-17.

[55] *See id.* at 116:24-117:6.

[56] *See* Docket No. 43 at 41:20-42:1.

[57] *Scott*, 550 U.S. at 380.

[58] *See* Docket No. 42-2.

[59] *See* Docket No. 50-1, Exs. A-J.

[60] *See* 550 U.S. at 379-80.

[61] *See* Docket No. 44 at 115:12-119:12.

[62] *See* Docket No. 39 at ¶¶ 4-6; Docket No. 44 at Ex. D.

1    that the whole incident, from when West got out of her car until she fired at Lam, lasted "[f]rom
2    ten to 15 seconds, fast, the whole thing didn't even take a minute."[63] The police radio recording,
3    however, shows that over a minute elapsed between West's arrival on the scene and Phelan's
4    announcement that shots had been fired.[64] These are real differences, but not nearly so significant
5    that no reasonable jury could credit any of Anderson's account. As for Wade, Defendants point out
6    that he told detectives on the night of the shooting that he was behind a tree across the street and
7    did not see West shoot Lam.[65] The relevant time period, however, includes not only the instant of
8    the shooting but also the moments leading up to it. Wade consistently says that he saw Lam
9    standing still, with his back to both officers, even after Phelan retrieved the 40 mm weapon.[66] In
10   this, his recollection differs drastically from West's—a genuine dispute about a material fact.
11   Deciding whether and how much to trust Anderson and Wade given the gaps in their testimony is
12   the quintessential task for the jury, not the court on summary judgment.

   ***Second***, this same genuine dispute of fact also precludes the court from granting summary
judgment on the issue of qualified immunity. A police officer who has violated an individual's
statutory or constitutional right nonetheless is entitled to qualified immunity unless that right was
clearly established when the violation occurred.[67] Viewing the evidence in the light most favorable
to Lam—in other words, assuming that Lam turned his back towards West and never advanced
towards her—the use of deadly force was unreasonable under any standard. In *Sheehan*, there was
no clearly established law that told officers whether they could run the risk of provoking a
confrontation by reentering the room of a mentally ill person who had threatened them with a

---

[63] *See* Docket No. 44 at 121:20-24.

[64] *See* Docket No. 42-2 at 2:48-4:15.

[65] *See* Docket No. 42-3 at 4:47-51, 10:47-11:00, 13:10-20; Docket No. 42-4 at 3:23-4:04.

[66] *See* Docket No. 42-3 at 0:51-1:05, 5:01-6:26, 8:45-10:40; Docket No. 42-4 at 0:10-1:35; Docket No. 43 at 41:20-42:1.

[67] *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014).

8
Case No. 5:14-cv-00877-PSG
ORDER GRANTING-IN-PART MOTION FOR PARTIAL SUMMARY JUDGMENT

knife.[68]  By contrast, the case law is clear that an officer cannot use deadly force against someone with his back turned who presents no threat to the officer or others.[69]

Summary judgment is appropriate, however, on Lam's claim against the City under *Monell*. In general, municipalities cannot be held vicariously liable for constitutional violations committed by their employees unless "action pursuant to official municipal policy of some nature caused a constitutional tort."[70]  The policy must "amount[] to deliberate indifference to [a plaintiff's] constitutional right" and be the "moving force behind the constitutional violation."[71]  A municipality may also be liable for ratifying a subordinate's constitutional violation if the municipality's authorized policymakers approve the decision to commit the violation and the basis for the decision.[72]  The City's failure to discipline West for allegedly disregarding her training does not equate to ratifying her actions absent a deliberate endorsement by policymakers, which Lam does not even allege.[73]

The City's alleged failure to monitor officers' vision or to maintain a better range qualification system also does not amount to deliberate indifference to a constitutional right.  A finding of deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action."[74]  In the context of a failure to train, city policymakers must be "on actual or constructive notice that a particular omission . . . causes city employees to violate

---

[68] *See* 135 S. Ct. at 1775-78.

[69] *See Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985); *see also Long v. City & Cty. of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007) ("The use of deadly force is 'reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." (quoting *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994))).

[70] *Monell*, 436 U.S. 658 at 691.

[71] *Anderson v. Warner*, 451 F.3d 1063, 1070 (9th Cir. 2006) (quoting *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992)).

[72] *See Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014), *reversed in part on other grounds*, 135 S. Ct. 1765 (2015).

[73] *See id.*

[74] *See Bd. of Cty. Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, (1997).

citizens' constitutional rights."[75]  Just as in *Tsao v. Desert Palace, Inc.*,[76] Lam has not offered any evidence that city officials had actual notice of these flaws in their policies.  In the absence of actual notice, Lam must provide evidence that the risk of constitutional violations "was so 'obvious' that ignoring it amounted to deliberate indifference"; this evidence may include a pattern of similar violations resulting from these omissions.[77]  Because he has failed to produce any such evidence, Lam has failed to make out a claim under *Monell*.

**SO ORDERED.**

Dated: September 23, 2015

*[signature]*
PAUL S. GREWAL
United States Magistrate Judge

---

[75] *See Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011).

[76] 698 F.3d 1128 (9th Cir. 2012).

[77] *Id.* at 1145-46.