UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUNG LAM,<br><br>    Plaintiff,<br><br>    v.<br><br>CITY OF SAN JOSE, et al.,<br><br>    Defendants. | Case No. 14-cv-00877-PSG<br><br>**ORDER DENYING MOTION FOR NEW TRIAL**<br><br>**(Re: Docket No. 166)** |

On January 3, 2014, San Jose police officer Dondi West shot Hung Lam on his front lawn, rendering him a paraplegic.[1] A jury found that West used unreasonable force against Lam, that she interfered with his exercise of constitutional rights and that she acted negligently towards him, even as it also found that she had not committed battery.[2] Arguing that the jury's verdict was both inconsistent and against the clear weight of the evidence, West and the City of San Jose now move for a new trial under Fed. R. Civ. P. 59(a).[3] After considering the parties' arguments and reviewing the evidence presented at trial, the court cannot say that the weight of the evidence cuts so clearly in Defendants' favor. Even if the jury's verdict was internally inconsistent, the Ninth Circuit has long preserved to the jury the prerogative of issuing a legally irreconcilable general verdict.[4] The motion is DENIED.

---

[1] *See* Docket No. 171 at 496:20-497:25, 499:23-500:15; Docket No. 173 at 1092:2-11.

[2] *See* Docket No. 139 at 2-3. The court bifurcated the trial between liability and damages phases; in the second phase, the jury awarded Lam $11.3 million in damages. *See* Docket No. 153 at 2.

[3] *See* Docket No. 166.

[4] *See Wei Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035-37 (9th Cir. 2003); *Int'l*

1
Case No. 14-cv-00877-PSG
ORDER DENYING MOTION FOR NEW TRIAL

# I.

Lam filed this suit in February 2014, bringing claims against West in her individual and official capacities, the City of San Jose and Defendant Larry Esquivel in his capacity as San Jose police chief.[5] Lam's complaint included six causes of action: (1) a claim under 42 U.S.C. § 1983 for unreasonable force and malicious prosecution against West; (2) a claim under Section 1983 for inadequate training against Esquivel and the City of San Jose; (3) assault and battery against West; (4) intentional infliction of emotional distress against West; (5) a claim under Cal. Civ. Code § 52.1, known as the Bane Act, against West and (6) negligence against West.[6] After fact and expert discovery concluded, Defendants moved for summary judgment on both Section 1983 claims,[7] and the court granted the motion only with respect to the claim against Esquivel and the City of San Jose.[8] The remaining claims proceeded to trial.[9]

Although the parties disagree—to say the least—about many of the circumstances surrounding the shooting, some facts are undisputed. Two days beforehand, on New Year's Day, 2014, Lam was behaving erratically. He spent much of the day in the driveway of the San Jose house he shared with his boyfriend, Kevin Wade, refusing to go indoors because he was afraid there might be someone inside.[10] Lam eventually called the police, who placed him under an involuntary psychiatric hold at a hospital nearby.[11] The hospital released Lam two days later.[12]

---

*Longshoremen's Union v. Hawaiian Pineapple Co.*, 226 F.2d 875, 881 (9th Cir. 1955).

[5] *See* Docket No. 1.

[6] *See id.* at ¶¶ 27-46.

[7] *See* Docket No. 37.

[8] *See* Docket No. 82.

[9] *See* Docket No. 122.

[10] *See* Docket No. 171 at 528:6-23, 529:8-530:8, 608:25-611:12.

[11] *See id.* at 530:9-531:17, 611:20-614:3.

[12] *See id.* at 531:5-17; 614:11-615:3.

Seeing that Lam still seemed upset, Wade suggested that the two of them visit Lam's family in Sacramento, and Lam agreed.[13]

When they stopped at home to pick up Lam's clothes, though, Lam again started acting strangely, picking up a knife and looking for an intruder.[14] Wade coaxed him outside, but Lam refused to leave and began threatening to cut himself with the knife.[15] Lam had Wade's phone, but Wade was able to flag down their next-door neighbors, Herman and Helen Anderson, to call the police.[16] Herman Anderson went into his house and called 911, while Helen Anderson—a retired deputy sheriff—walked over to Lam, who was still standing on his lawn, and started talking to him.[17] Anderson kept on her side of the lawn, which was easy to identify because the Andersons' lawn was mostly dirt while Lam's had grass.[18] Wade stayed somewhere nearby; he remembers being on the lawn near Lam, but Anderson says that he actually was standing across the street.[19] The conversation between Lam and Anderson was calm, but Lam still was agitated and periodically motioned as if to cut his wrist.[20]

West arrived on the scene a few minutes later,[21] responding to a police dispatch about an

---

[13] *See id.* at 531:19-535:20.

[14] *See id.* at 536:15-539:14.

[15] *See id.* at 541:8-543:11.

[16] *See id.* at 548:11-549:25; Docket No. 172 at 763:4-764:19.

[17] *See* Docket No. 171 at 550:5-552:15; Docket No. 172 at 761:1-14; 765:3-766:20, 767:2-768:9.

[18] *See* Docket No. 171 at 569:18-23; Docket No. 172 at 780:9-18.

[19] *See* Docket No. 171 at 551:5-9; Docket No. 172 at 766:21-767:1.

[20] *See* Docket No. 171 at 551:20-553:25, 640:8-641:15; Docket No. 172 at 768:11-775:5. Lam himself did testify at trial, but he could recall little of the incident other than wanting to cut himself and feeling upset because he had not seen Wade during his two-day hold at the hospital. *See* Docket No. 173 at 1096:16-1103:19, 1115:6-1117:21.

[21] *See* Docket No. 171 at 554:1-18; Docket No. 172 at 775:6-16.

incident involving two men arguing, one armed with a knife.[22] The dispatcher also mentioned that a female retired sheriff's deputy—meaning Anderson—was talking to the man with the knife.[23] When West reached the scene, she got out of her squad car and moved quickly towards Lam with her gun drawn while ordering Anderson to get back and loudly commanding Lam to drop the knife.[24] Later on, a second officer, Dan Phelan, joined West and then went back to the trunk of his squad car to retrieve a 40 mm "less-lethal" weapon.[25]

On the critical facts, however, the parties' accounts differ dramatically. As West remembered it, Lam first dropped his cell phone, which she initially thought was a knife, in response to her command, leaving his hands empty.[26] But when West approached Lam to subdue him—with Phelan, who had arrived by then—Lam appeared to pull a knife out of his waistband.[27] West testified that she saw the knife and backed away, and Lam walked forwards, away from her, while poking the knife into his stomach; West interpreted that gesture to mean that Lam may have been suicidal.[28] Phelan then went back to his car to retrieve the 40 mm weapon.[29] When Lam reached the driveway, however, West said that he began to walk towards her—at times moving

---

[22] *See* Docket No. 170 at 254:22-24, 255:21-256:10, 331:22-24, 412:5-13; Docket No. 173 at 1237:3-21.

[23] *See* Docket No. 170 at 421:22-25, 432:24-433:10; Docket No. 173 at 1240:20-1241:6.

[24] *See* Docket No. 170 at 436:4-9, 438:2-13, 450:17-451:24; Docket No. 171 at 554:1-25; Docket No. 172 at 775:6-778:15, 817:18-818:24; Docket No. 173 at 1246:17-25, 1249:15-23, 1253:1-5.

[25] *See* Docket No. 170 at 256:21-257:6, 260:15-261:17, 264:5-7, 281:24-282:8, 283:5-7; Docket No. 171 at 487:2-23, 559:14-560:1. Anderson did not remember Phelan's presence at all until after Lam was shot. *See* Docket No. 172 at 823:15-25, 824:11-14.

[26] *See* Docket No. 170 at 450:11-451:22, 455:15-456:7; Docket No. 173 at 1257:22-1259:10.

[27] *See* Docket No. 170 at 452:15-17, 453:12-454:10, 459:2-462:6; Docket No. 173 at 1260:9-1262:14, 1264:23-1265:20, 1266:4-23, 1270:10-21.

[28] *See* Docket No. 170 at 463:7-9, 464:4-15, 467:7-468:4; Docket No. 173 at 1266:2-3, 1267:10-1268:23.

[29] *See* Docket No. 170 at 465:22-466:7, 467:2-4; Docket No. 171 at 486:12-487:23; Docket No. 173 at 1269:6-13.

4
Case No. 14-cv-00877-PSG
ORDER DENYING MOTION FOR NEW TRIAL

backwards while looking at her over his shoulder, and at times facing her.[30] She retreated from him, but she felt her right foot hit a bush and could not go any further backwards.[31] When Lam had gotten within eight to ten feet of her, West fired the first time.[32] He turned around slightly and took a few more backwards steps towards her while looking over his shoulder at her.[33] She fired again, and he fell.[34]

Anderson, who had a clear view of the entire incident,[35] recalled it very differently. She testified that she moved back about eight or ten feet when West asked her to.[36] After that, Anderson said that West, while standing in or near the Andersons' yard, ordered Lam to drop the knife and get down on the ground.[37] Lam threw his cell phone down a few feet in front of him, turned away from West and started poking at his stomach with the knife.[38] Anderson said that West, from a range of ten or fifteen feet, fired twice immediately afterwards, and Lam fell to the ground.[39] Anderson estimated that the whole incident—from West's arrival until the shooting—took ten or fifteen seconds; "[i]t was a continuous movement from the time [West] got out of the car through telling [Anderson] to move, telling [Lam] to drop the knife . . . it was bang, bang,

---

[30] *See* Docket No. 171 at 494:22-496:15; Docket No. 173 at 1273:10-16, 1274:16-20, 1275:6-1276:10.

[31] *See* Docket No. 171 at 502:3-503:9; Docket No. 173 at 1274:21-1275:20, 1279:14-1280:6.

[32] *See* Docket No. 171 at 496:20-24; Docket No. 173 at 1281:16-22, 1284:2-12.

[33] *See* Docket No. 171 at 496:25-497:8; Docket No. 173 at 1284:13-1285:12.

[34] *See* Docket No. 171 at 497:9-10, 499:23-25, 500:6-15; Docket No. 173 at 1285:13-1286:23.

[35] *See* Docket No. 172 at 779:7-12.

[36] *See id.* at 777:24-778:10, 778:24-779:6, 816:18-21.

[37] *See id.* at 779:13-16, 816:22-817:3, 818:10-819:7.

[38] *See id.* at 779:17-780:5, 819:3-820:9, 822:2-22; Docket No. 174 at 1390:24-1391:8.

[39] *See* Docket No. 172 at 784:25-785:22, 822:23-823:18, 824:15-17.

bang, bang."[40]  Anderson also said that Lam had the knife in his right hand the entire time and never pulled it from his waistband.[41]

Two other percipient witnesses offered their accounts at trial as well.  Wade agreed with Anderson that Lam had the knife in his hand throughout the encounter.[42]  According to Wade, when West first arrived, she bore down on Lam while yelling commands at him, and Lam turned his back to her.[43]  Sometime after that, Wade said he moved across the street, from where he saw Phelan get the 40 mm weapon but not West shooting Lam.[44]  As far as Wade remembered, Lam always stood in the middle of his yard, while West stayed close to the Andersons' yard.[45]

As for Phelan, he said that Lam's hands were empty and in the air when Phelan arrived.[46]  Phelan ran up beside West with his gun drawn, and West told him that Lam had dropped a knife.[47]  But when the pair of officers approached Lam, West told Phelan that Lam now had a knife, and Phelan retreated to get the 40 mm weapon from his car.[48]  Phelan first saw the knife, which he described as pressed to Lam's stomach, when he was running back to his vehicle.[49]  Phelan said

---

[40] *Id.* at 824:18-825:21; *see id.* at 797:9-20.

[41] *See id.* at 809:3-24.

[42] *See* Docket No. 171 at 557:6-19.

[43] *See id.* at 559:4-11.

[44] *See id.* at 559:14-561:2, 580:12-581:23, 603:3-5, 666:3-668:3.

[45] *See id.* at 561:3-562:14, 582:22-583:2, 665:24-666:8, 684:17-22.

[46] *See* Docket No. 170 at 262:24-263:24, 270:23-271:4.

[47] *See id.* at 271:5-9, 272:15-16, 281:12-14.

[48] *See id.* at 282:13-18.

[49] *See id.* at 281:1-11, 281:21-23, 282:13-284:21.

that Lam was moving throughout in an erratic pattern.[50] In the moments when West shot Lam, however, Phelan did not remember Lam advancing towards West.[51]

The remaining evidence presented at trial—including physical and documentary evidence and expert testimony—was not conclusive in either direction. Photographic evidence did establish that Lam was shot only once, in the back.[52] Most notably for the purposes of this motion, some of the evidence undercut Anderson's account in some important respects. First, although Anderson recalled the whole incident occurring very quickly, a police radio recording shows that over a minute elapsed between when West arrived at the scene and when Phelan and West radioed that shots had been fired.[53] Second, though Anderson said that neither West nor Lam moved significantly from where they stood when West first arrived, the cell phone was at least ten feet away from Lam when he fell.[54] Furthermore, given the location of the shell casings, West could not have been standing where Anderson says West was when she fired.[55]

In their closing arguments, Defendants understandably made much of these contradictions.[56] Nevertheless, the jury found for Lam on his claims under Section 1983, under the Bane Act and for common-law negligence.[57] At the same time, the jury found for West on

---

[50] *See id.* at 264:8-14, 274:17-275:3.

[51] *See id.* at 297:23-298:8, 307:14-23, 320:1-25.

[52] *See* Trial Exs. 138, 139.

[53] *See* Trial Ex. 103 at 2:54-4:20.

[54] *See* Trial Exs. 3L, 3M (depicting the cell phone at the location marked "4," whereas Lam fell near his clothes at the location marked "8").

[55] *See* Docket No. 174 at 1426:7-14; Trial Ex. 30.

[56] *See* Docket No. 175 at 1659:21-1663:5.

[57] *See* Docket No. 139 at 2-3. On the negligence claim, the jury assigned Lam 35% of the responsibility for the shooting. *See id.* at 3.

7
Case No. 14-cv-00877-PSG
ORDER DENYING MOTION FOR NEW TRIAL

1  Lam's claim for state-law battery.[58]  The trial continued to the damages phase, where the jury

2  awarded Lam $11.3 million in economic and noneconomic damages.[59]  Defendants filed no

3  motions for judgment as a matter of law during trial but now move for a new trial on a number of

4  grounds.[60]

## II.

This court has jurisdiction under 28 U.S.C. §§ 1331 and 1367.  The parties further consent to the jurisdiction of the undersigned under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 72(a).[61]

---

[58] *See id.* at 2.

[59] *See* Docket No. 153 at 2.

[60] *See* Docket No. 166.  Defendants ask the court to evaluate the merits of their motion in light of "the public discussion and controversy about police shootings" during the weeks and months preceding and during the trial.  *Id.* at 5-6; *see* Docket No. 185 at ¶¶ 2-3, 8-9.  Most notably, on the first day of testimony in the trial in this case, San Francisco police officers shot and killed Mario Woods, who may have been holding a knife in his hand, in an encounter that several bystanders captured on video.  *See* Docket No. 185 at ¶ 4; Docket No. 185-1, Ex. B (television news broadcasts describing the shooting).  On the day the jury began deliberating, Lam's counsel held a press conference with Woods' mother announcing that he would represent her in her suit against the city of San Francisco; the press conference was covered on television and radio outlets, and pictures of Lam's counsel with Woods' mother appeared in a prominent San Jose newspaper.  *See* Docket No. 185-1, Exs. D, E.  The protests that followed the Woods shooting, including calls for issuing more non-lethal weapons to police officers, also were covered in the news media.  *See* Docket No. 185 at ¶ 5; Docket No. 185-1, Ex. C.

Defendants raised this issue at the start of the next trial day after Woods was shot, and they successfully persuaded the court to issue a preemptive instruction that the jury should ignore this coverage in deciding West's liability.  *See* Docket No. 171 at 482:9-484:12.  Accordingly, the court told the jury to set aside its thoughts about any other events "and ultimately deliberate and focus on what you're hearing in this courtroom and from these witnesses and from your reading from these documents and other things that are admitted.  That's what this case is about and should be about."  *Id.* at 485:11-22.  Defendants brought the issue up again after Lam's counsel held the press conference with Woods' mother, but Defendants sought no further relief.  *See* Docket No. 177 at 1745:2-1749:8.  The court sees no reason to doubt that the jury did exactly what the court asked it to do, and it does not consider these extraneous circumstances in ruling on the motion at issue here.

[61] *See* Docket Nos. 7, 13, 25.

---

8
Case No. 14-cv-00877-PSG
ORDER DENYING MOTION FOR NEW TRIAL

**III.**

Rule 59(a)(1)(A) says that the court may order a new jury trial "for any reason for which a new trial has heretofore been granted in an action in federal court." Although "Rule 59 does not specify the grounds on which a motion for a new trial may be granted," courts are "bound by those grounds that have been historically recognized."[62] These grounds "include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'"[63] The Ninth Circuit has elaborated that "[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice."[64] "Therefore, in a nut shell, the district court may grant a new trial '[i]f, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . .'"[65]

In making this determination, the court "is not required to view the trial evidence in the light most favorable to the verdict."[66] "Instead, the district court can weigh the evidence and assess the credibility of the witnesses."[67] The court may "set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence."[68] However, "[i]t is not the courts' place to

---

[62] *Wei Zhang*, 339 F.3d at 1035.

[63] *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)).

[64] *Id.* (quoting *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000))).

[65] *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1087-88 (9th Cir. 2009) (alterations in original) (quoting *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371-72 (9th Cir. 1987)).

[66] *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014) (citing *Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010) (per curiam)).

[67] *Id.*

substitute our evaluations for those of the jurors."[69]  As a result, "a district court may not grant a new trial simply because it would have arrived at a different verdict."[70]

*First*, Defendants contend that the jury's verdicts against West on the Section 1983 claim, the battery claim and the Bane Act claim were against the clear weight of the trial evidence.  For the Section 1983 claim, the Fourth Amendment standard of "objective reasonableness" governs the use of force by police officers.[71]  Relevant factors include the severity of the crime, the immediate threat posed by the suspect and whether the suspect is actively resisting or evading arrest.[72]  Of these, the most important factor is the immediate threat that the suspect posed.[73]  "These factors are not exclusive, and [courts] consider the totality of the circumstances."[74]  Officers should be judged "without the benefit of 20/20 hindsight," and the court should take into account that police officers often must make split-second decisions in uncertain and rapidly changing situations.[75]

The key issue at trial—and the most important factor in the Fourth Amendment analysis—was whether Lam posed a threat to West or to anyone else.  Anderson and Wade testified unequivocally that he did not.  Defendants correctly observe that, in some important respects, their accounts cannot be reconciled with the physical or documentary evidence.  But the fact remains

---

[68] *Molski*, 481 F.3d at 729 (alteration in original) (quoting *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990)).

[69] *Union Oil Co. of Cal. v. Terrible Herbst, Inc.*, 331 F.3d 735, 743 (9th Cir. 2003).

[70] *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001).

[71] *Graham v. Connor*, 490 U.S. 386, 394-99 (1989); *Scott v. Harris*, 550 U.S. 372, 381-83 (2007).

[72] *See Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) (en banc) (quoting *Graham*, 490 U.S. at 396).

[73] *See id.*

[74] *Id.* at 793-94.

[75] *Id.* at 794.

that, discrepancies in timing and location aside, Anderson in particular saw the incident from start to finish and testified repeatedly, on both direct and cross-examination, that Lam never moved towards West. Defendants raised legitimate issues about her credibility, but the jury still was entitled to give her story some weight. Also, on one important point, the physical evidence supported Anderson's testimony: Lam was shot in the back.

Even West's testimony, taken alone, lends some support to the notion that Lam posed no threat. At no point did she see Lam directing any sort of menacing gesture at her. Instead, West, like Phelan, saw Lam poking the knife into his stomach and felt that he might be suicidal. And throughout the incident, Lam never raised his knife at West or even moved quickly in her direction. To be sure, West testified that when Lam was walking towards her with the knife, she felt that her life was in danger and that she had to shoot him.[76] But the standard for unreasonable force is an objective one.[77] After considering the totality of the circumstances surrounding the shooting—or, put another way, after "slosh[ing] [their] way through the factbound morass of 'reasonableness'"[78]—the jury concluded that West's subjective fear was unreasonable, and so was her use of force. Even assuming the court would have reached the opposite result, a difference in opinion is not justification for a new trial.

The same goes for the negligence claim. In California, negligence "liability can arise if the tactical conduct and decisions leading up to the use of deadly force show, as part of the totality of circumstances, that the use of deadly force was unreasonable."[79] Lam argued to the jury that West acted negligently by failing to de-escalate the situation when she first arrived, instead choosing to

---

[76] *See* Docket No. 173 at 1275:4-5, 1280:21-1281:21, 1285:10-12.

[77] *See Mattos v. Agarano*, 661 F.3d 433, 441-42 (9th Cir. 2011) (en banc) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001)) ("[W]hen we consider whether there was an immediate threat, a 'simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern.'").

[78] *Scott*, 550 U.S. at 383.

[79] *Hayes v. County of San Diego*, 57 Cal. 4th 622, 626 (2013).

11
Case No. 14-cv-00877-PSG
ORDER DENYING MOTION FOR NEW TRIAL

move in with her gun drawn while giving loud commands to Lam. Lam successfully persuaded the jury either that this pre-shooting conduct did not meet the applicable standard of care or that the shooting itself did not. Neither is reason for a retrial.

Finally, no new trial is required for the Bane Act claim.[80] Defendants argue that "the trend [in Bane Act claims] is to require proof of additional facts establishing 'threats, intimidation, or coercion' *independent* of the Fourth Amendment violation itself."[81] But Defendants failed to raise this purely legal argument in a motion to dismiss, a motion for summary judgment or a motion for judgment as a matter of law.[82] Such a "legal matter cannot be appropriately considered on a motion for a new trial, where the issue is whether the jury's verdict is against the clear weight of the evidence."[83] On that ground alone, the court denies the motion for a new trial on the Bane Act claim.

In any case, although Defendants suggest a "trend," the cases actually reveal a split of

---

[80] The Bane Act creates a cause of action when someone "interferes by threat, intimidation, or coercion . . . with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." Cal. Civ. Code § 52.1(a).

[81] Docket No. 184 at 27.

[82] Defendants did not move to dismiss or for judgment as a matter of law, but Defendants did move for summary judgment on several other issues. *See* Docket No. 37. As above, the court granted that motion in part. *See* Docket No. 82. Defendants first argued their interpretation of the Bane Act in their trial brief, *see* Docket No. 62 at 15-16, and when objecting to Lam's proposed jury instruction. *See* Docket No. 102 at 18-19.

[83] *Tortu*, 556 F.3d at 1085; *see also Parton v. White*, 203 F.3d 552, 556 (8th Cir. 2000) ("Rule 59 motions cannot be used to introduce new evidence, tender new legal theories, or raise arguments that could have been offered or raised prior to entry of judgment."); *Grumman Aircraft Eng'g Corp. v. Renegotiation Bd.*, 482 F.2d 710, 721 (D.C. Cir. 1973) ("Ordinarily Rule 59 motions for either a new trial or a rehearing are not granted by the District Court where they are used by a losing party to request the trial judge to reopen proceedings in order to consider a new defensive theory which could have been raised during the original proceedings."), *rev'd on other grounds*, 421 U.S. 168 (1975); *Lombino v. Bank of Am., N.A.*, 797 F. Supp. 2d 1078, 1081 (D. Nev. 2011) ("Defendants' post-trial legal arguments are not properly before the court on a motion for new trial.").

authority on whether the coercion inherent in the use of excessive force can constitute a violation of the Bane Act.[84]  The recent decisions in *Allen v. City of Sacramento*[85] and *Lyall v. City of Los Angeles*[86] leave the ambiguity intact because they involved only an allegedly unlawful detention or search.[87]  Several courts in this district "have applied the Bane Act to a claim of excessive force alone."[88]  In this procedural posture, the court cannot order a new trial to resolve the split.  That is the job of the appellate court alone.

***Second***, Defendants raise another problem with the jury's verdict: it was inconsistent as a matter of law.  The jury found West liable for using unreasonable force against Lam, but it also found that West had not battered him, even though the latter claim also turned on whether West's use of force was reasonable.  California courts analyze the reasonableness of the use of force in the context of a battery claim under the Fourth Amendment standard.[89]  Defendants therefore argue that under the circumstances of this case, the two causes of action must rise and fall together as a matter of law.

---

[84] *See Davis v. City of San Jose*, 69 F. Supp. 3d 1001, 1007-08 (N.D. Cal. 2014) (recognizing and discussing the split of authority); *Haynes v. City & County of San Francisco*, Case No. 09-cv-00174, 2010 WL 2991732, at *6 (N.D. Cal. July 28, 2010) (same).

[85] 234 Cal. App. 4th 41 (2015).

[86] 807 F.3d 1179 (9th Cir. 2015).

[87] *See Lyall*, 807 F.3d at 1196 (citing *Allen*, 234 Cal. App. 4th at 69; *Quezada v. City of Los Angeles*, 222 Cal. App. 4th 993, 1008 (2014); *Shoyoye v. County of Los Angeles*, 203 Cal. App. 4th 947, 959 (2012)) ("Numerous California decisions make clear that a plaintiff in a search-and-seizure case must allege threats or coercion beyond the coercion inherent in a detention or search in order to recover under the Bane Act."); *Allen*, 234 Cal. App. 4th at 69 (citing *Shoyoye*, 203 Cal. App. 4th at 960) ("[W]e conclude a wrongful arrest or detention, without more, does not satisfy both elements of [the Bane Act].").

[88] *Davis*, 69 F. Supp. 3d at 1008 (citing *Cardoso v. County of San Mateo*, Case No. 12-cv-05130, 2013 WL 900816 (N.D. Cal. Jan. 11, 2013); *Rodriguez v. City of Modesto*, Case No. 10-cv-01370, 2013 WL 6415620, at *10-13 (E.D. Cal. Dec. 9, 2013)); *see also Russell v. City & County of San Francisco*, Case No. 12-cv-00929, 2013 WL 2447865, at *15-17 (N.D. Cal. June 5, 2013).

[89] *See Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527-28 (2009).

Surprisingly, the parties give short shrift to the threshold question of how to characterize the verdict,[90] which "is a prerequisite analytical step in determining how to treat inconsistent jury findings."[91] Although the parties gloss over this issue, the court cannot. As Defendants acknowledge, "inconsistent general verdicts on separate claims are typically permitted to stand."[92] By contrast, "irreconcilably inconsistent special verdicts require a new trial."[93]

The Ninth Circuit has explained in some detail how to distinguish a general verdict from a special one. "If the jury announces only its ultimate conclusions, it returns an ordinary general verdict; if it makes factual findings in addition to the ultimate legal conclusions, it returns a general verdict with interrogatories."[94] "A jury may return multiple general verdicts as to each claim . . . without undermining the general nature of its verdicts."[95]

Under this standard, the jury delivered a general verdict on both claims. On the Section 1983 claim, the court asked only two questions: (1) "Do you find by a preponderance of the evidence that Defendant Officer Dondi West used unreasonable force against Plaintiff Hung Lam?" and, if so, (2) "Do you find by a preponderance of the evidence that Officer West substantially caused Mr. Lam to suffer any injury caused by Officer West's unreasonable force in Question 1 above?"[96] On the battery claim, the verdict form was even more basic: "Do you find

---

[90] Defendants address the question only in passing, *see* Docket No. 184 at 24-25, while Lam ignores it entirely.

[91] *Duhn Oil Tool, Inc. v. Cooper Cameron Corp.*, 818 F. Supp. 2d 1193, 1219 (E.D. Cal. 2011) (citing *Wei Zhang*, 339 F.3d at 1031).

[92] *Id.* at 1219 (citing *Wei Zhang*, 339 F.3d at 1036-38).

[93] *Id.* (citing *Floyd v. Laws*, 929 F.2d 1390, 1396 (9th Cir. 1991)).

[94] *Wei Zhang*, 339 F.3d at 1031. A pure special verdict, where the jury "returns only factual findings, leaving the court to determine the ultimate legal result," clearly does not apply here. *Id.*

[95] *Id.*

[96] Docket No. 133 at 1.

14
Case No. 14-cv-00877-PSG
ORDER DENYING MOTION FOR NEW TRIAL

by a preponderance of the evidence that Officer West battered Mr. Lam?"[97] The jury announced only its ultimate legal conclusions on each of these causes of action, and its verdicts were general in nature. Even assuming that these two general verdicts were inconsistent—an issue that the court need not and does not reach—they may stand as they are.

Defendants nevertheless argue that these verdicts must be reconciled because they "entail[ed] implied resolution of factual disputes underlying the legal question."[98] That argument is not persuasive. *Duhn Oil Tool*, the case Defendants cite in support, involved a legal conclusion that was "an absolute prerequisite" to another.[99] As the *Duhn Oil Tool* court noted, the Ninth Circuit explicitly considered this possibility in *Wei Zhang* when it held that inconsistent general verdicts must stand "[u]nless one legal conclusion is the prerequisite for another."[100] But here, Lam's Section 1983 and battery claims were independent. Defendants' proposed rule would entirely undermine *Wei Zhang*—every general verdict on an independent cause of action entails the implied resolution of a factual dispute.[101]

To be sure, the court could have eliminated this risk entirely by adopting Defendants' proposal to instruct the jury that the standard for excessive force was the same for purposes of both state-law battery and the Fourth Amendment.[102] Although doing so may have eliminated any

---

[97] *Id.*

[98] Docket No. 184 (quoting *Duhn Oil Tool*, 818 F. Supp. 2d at 1221).

[99] 818 F. Supp. 2d at 1220.

[100] *Wei Zhang*, 339 F.3d at 1034.

[101] In fact, in *Wei Zhang*, the party seeking a new trial argued that a federal claim and a state law claim "were legally indistinguishable under any set of facts and thus that no rational jury could find liability on one and not the other claim." *Id.* at 1032. The Ninth Circuit nevertheless declined to order a new trial because the jury had issued a general verdict. *See id.* at 1034. Defendants' argument here is essentially identical.

[102] *See* Docket No. 102 at 17; Docket No. 174 at 1552:17-1554:4. The *Wei Zhang* court suggested that district courts should address the potential for a legally irreconcilable verdict through jury instructions. *See* 339 F.3d at 1037. The Ninth Circuit went on to say that an "[o]bjection to an inconsistency between two general verdicts that is traced to an alleged error in the jury instruction

15
Case No. 14-cv-00877-PSG
ORDER DENYING MOTION FOR NEW TRIAL

chance of a split verdict on these causes of action, the court was not convinced that the two claims necessarily rose and fell together. Instead, the court elected to minimize any risk of error by offering instructions for these claims that were based on the relevant model jury instructions and that accurately captured the applicable law. If the result of this decision really was an inconsistent verdict—again, a question the court does not resolve—it still was preferable to possibly resolving a question of law prematurely and incorrectly. All in all, these arguably inconsistent general verdicts do not necessitate a new trial.

*Third*, Defendants seek a new trial on the basis of the court's decision not to ask the jury for a factual determination of the circumstances surrounding the shooting. Such an interrogatory, Defendants argue, was the only fair way to adjudicate whether West was entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[103] There are two steps in a qualified immunity analysis: (1) "whether a constitutional right was violated, which is a question of fact," and (2) "whether the right was clearly established, which is a question of law."[104] Ordinarily, litigants cannot seek a new trial on the basis of this second prong; instead, they must raise this issue through motions for judgment as a matter of law under Fed. R. Civ. P. 50.[105] In this case, however, Defendants mount a less direct challenge, disputing the process of deciding qualified immunity rather than the outcome.

The problem with Defendants' approach is that the Ninth Circuit has foreclosed this

---

or verdict sheet is properly made under Fed. R. Civ. P. 51." *Id.* (quoting *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 56 (2d Cir. 2002)). Defendants do not raise such an objection now.

[103] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[104] *Tortu*, 556 F.3d at 1085.

[105] *See id.*

16
Case No. 14-cv-00877-PSG
ORDER DENYING MOTION FOR NEW TRIAL

specific line of argument,[106] largely because the court has wide discretion in deciding whether to give special interrogatories to the jury.[107]  Here, the court did not provide a special interrogatory because each of the factors that may have rendered her use of force unreasonable came from well-established law.  When West shot Lam, it was well-established Ninth Circuit law that the use of deadly force could be unreasonable if Lam posed no threat of serious physical harm to West or to others.[108]  It also was well established that, before using deadly force, West should have considered the availability of alternative methods of capturing or subduing Lam[109] and whether Lam was emotionally disturbed.[110]  The court's instruction to the jury on the Section 1983 claim included each of these factors.[111]  If the jury found that West violated Lam's rights under the Fourth Amendment, then, those rights already were well established at the time that she acted.[112]  Under these circumstances, a separate special interrogatory was unnecessary.[113]  The court

---

[106] *See Acosta v. City & County of San Francisco*, 83 F.3d 1143, 1149 (9th Cir. 1996), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194, 202 (2001); *see also Willis v. City of Fresno*, Case No. 09-cv-01766, 2014 WL 1419239, at *15-18 (E.D. Cal. Apr. 14, 2014) (denying a motion for new trial on this basis).

[107] *See Ruvalcaba v. City of Los Angeles*, 167 F.3d 514, 521 (9th Cir. 1999); *see also* Fed. R. Civ. P. 49(b).

[108] *See Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

[109] *See Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc) (citations omitted).

[110] *See Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011); *Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010); *Deorle*, 272 F.3d at 1283.

[111] *See* Docket No. 132 at 12.

[112] Defendants rely on the Supreme Court's recent decision in *City and County of San Francisco v. Sheehan*, where the Court held that defendant police officers were entitled to qualified immunity against a claim that they violated the plaintiff's Fourth Amendment rights by reentering her room when they knew she was suffering from mental illness.  135 S. Ct. 1765, 1775-78 (2015).  That case is inapposite because the use of force itself was not in issue.  *See id.* at 1775 ("We also agree with the Ninth Circuit that after the officers opened Sheehan's door the second time, their use of force was reasonable.").

[113] Although Defendants suggested that the court should give the jury a special interrogatory on

17
Case No. 14-cv-00877-PSG
ORDER DENYING MOTION FOR NEW TRIAL

1  therefore declined to include such an interrogatory in the verdict form, and it acted well within its

2  discretion in doing so.

3     ***Fourth***, Defendants argue that the jury instructions on the Section 1983 claim failed to

4  properly explain Fourth Amendment liability.  The court's instruction directly followed the Ninth

5  Circuit's model jury instructions,[114] but Defendants believe those instructions do not explain

6  sufficiently that whether the victim poses an immediate threat to the officer is the most important

7  factor in the reasonableness analysis.[115]  Defendants also argue that the instruction failed to

8  explain that West's allegedly wrongful conduct in approaching Lam, such as a failure to de-

9  escalate the situation, could not form the basis for a Fourth Amendment violation.

10     The instruction was correct.  "[J]ury instructions must fairly and adequately cover the

11  issues presented, must correctly state the law, and must not be misleading."[116]  It is true that "a

12  district court's '[u]se of a model jury instruction does not preclude a finding of error.'"[117]  But

13  here, the model jury instruction accurately captured the relevant factors that were to guide the jury

14  in deciding what level of force was appropriate.  As the court explained during the charge

15  conference,[118] under Ninth Circuit precedent the jury could consider aspects of West's conduct

16  prior to the shooting in deciding the reasonableness of her use of force.[119]  And Defendants

---

[this issue, *see* Docket No. 62 at 11-12; Docket No. 174 at 1550:6-10, they did not include such an interrogatory in their proposed verdict form.  *See* Docket No. 114.]

[114] *Compare* Docket No. 132 at 12, *with* Ninth Circuit Manual of Model Civil Jury Instructions § 9.23 (2007), *available at* http://www3.ce9.uscourts.gov/jury-instructions/sites/default/files/WPD/Civil_Instructions_2016_4.pdf.

[115] *See Smith v. City of Hemet*, 394 F.3d at 702.

[116] *Hunter v. County of Sacramento*, 652 F.3d 1225, 1232 (9th Cir. 2011) (quoting *Dang v. Cross*, 422 F.3d 800, 804 (9th Cir. 2005)).

[117] *Id.* (alteration in original) (quoting *Dang*, 422 F.3d at 805).

[118] *See* Docket No. 174 at 1550:14-1552:6.

[119] *See Espinosa v. City & County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (quoting *Scott*, 550 U.S. at 384) ("The parties['] 'relative culpability[,]' *i.e.*, which party created the

could—and did—argue to the jury that the threat that Lam posed to West, or at least that West reasonably believed that Lam posed, rendered her use of deadly force reasonable.[120]  The jury instructions "provided [Defendants] with ample room to argue [their] theory of the case to the jury."[121]  They do not provide grounds for a new trial.

**SO ORDERED.**

Dated: May 13, 2016

_____
PAUL S. GREWAL
United States Magistrate Judge

---

dangerous situation and which party is more innocent, may also be considered."); *Smith v. City of Hemet*, 394 F.3d at 703 (citing *Chew v. Gates*, 27 F.3d 1431, 1440 n.5 (9th Cir. 1994)) ("[A]n additional factor that we may consider in our *Graham* analysis is the availability of alternative methods of capturing or subduing a suspect.").

[120] *See* Docket No. 175 at 1658:24-1659:12.

[121] *Brewer v. City of Napa*, 210 F.3d 1093, 1097 (9th Cir. 2000); *see also Fikes v. Cleghorn*, 47 F.3d 1011, 1014 (9th Cir. 1995)).

19
Case No. 14-cv-00877-PSG
ORDER DENYING MOTION FOR NEW TRIAL